Okay, our next case up for argument is Great-West Life & Annuity Insurance Company v. Harrington. Good morning, Your Honors. May it please the Court? My name is James Perrero. I am an attorney representing the appellant, Dr. Michael Harrington. May I reserve six minutes for rebuttal? Clock is counting down. Thank you, Your Honor. This is a case about an insurance company trying to rescind policies based on facts it had notice of before issuing coverage. This Court should overturn the District Court's order granting summary judgment and order that, with respect to the key disputed facts, giving rise to Great-West's rescission claim and Dr. Harrington's breach of contract claim, that these items should be tried to a jury. As an initial matter, Dr. Harrington asked the Court to disregard footnote one of its reply regarding ambiguity and whether that's a legal issue for the Court to decide. We agree that the Court should determine that ambiguity is a legal matter, that the Court should determine in this case that the musculoskeletal questionnaire at issue here was ambiguous. There's no disputed fact as to what it said. There's no disputed fact as to Dr. Harrington's responses thereto. And it is our position that the language in that questionnaire does not meet the standard under Illinois law for sufficient specificity as articulated in the Unger v. MetLife case, which is not cited in the brief, and for the Court's reference, that's 103 Illinois App. 2nd, 150. So let me – help me understand this area of insurance law. So he provided these answers in his application, correct? Correct. So are his – are the questions and answers part of the policy? It is our understanding, yes, Your Honor, that those application questions would be part of the policy. And his answers? Yes, Your Honor. Okay. So then, you know, when an – usually when an insurance policy has an ambiguous provision, I guess the Court decides whether or not it's ambiguous. Yes, that is our position, Your Honor. Is that your argument? No, is there any case law that supports that? I believe there is, Your Honor, and those cases have been cited in the briefing submitted to the Court, that when there's a contract ambiguity or there's an ambiguity in the policy, that should be decided by the Court. I don't have the cites at hand. So it's our position that that provision was ambiguous and that Illinois law requires sufficient specificity, and more under the authority of the Hatch v. Woodman decision, which is cited in the brief, that that Court would find that this language was not sufficiently plain, simple, or unambiguous. And as a consequence, Great West is not entitled to rely on Dr. Harrington's responses to the musculoskeletal questionnaire as a basis to rescind the contract. Now, with respect to the initial – What was going on in – what page is this? Just a second. ER – to ER 65, the musculoskeletal questionnaire, where your client – what was the date of the last episode of pain? And he says, this is an inaccurate medical record and does not exist. Correct, Your Honor. The prompt for the musculoskeletal questionnaire references a condition of chronic neck pain as referenced in the December 2011 medical record that was written by Dr. Pena. Okay, but it also says, with paresthesia and bilateral hand numbness, precisely what the basis of his claim is. Correct, Your Honor. And so the issue is that it was not a chronic condition. So my client's position at the time was that it was not persistent or continuous, and that on the occasion of his visit to Dr. Pena, it was a one-off occurrence that did not recur shortly thereafter, and it resolved on that occasion. So it was his position that the assertion that he had a chronic neck condition as of December 2011 was inaccurate, which is why he responded in the manner that he did. The application that Great West prepared and provided for my client to respond to that the applicant has the opportunity to challenge any of his medical records, which was part of what occurred in his response to that questionnaire. Now, it's our position that Great West was on notice as to the paresthesia and numbness condition because it had access to this Pena record, this December 2011 record, which was provided in the application. Wasn't that what they based this question on when they framed this question to him, when they sent him these two muscotelicals questions? Yes. I mean, it was based on what they saw in Pena's record, correct? That's correct. That's what prompted these questions. That's accurate. And then when he gave the first response, they sort of, hmm, this doesn't measure up with what we're seeing in Dr. Pena's records. Correct. And they sent him the second one, and he says this, and then he elaborates a little bit, this was a one-time occurrence due to a poor night's sleep. Correct, Your Honor. It shouldn't resolve the next day, right? Correct, Your Honor. And so the issue is that my client responded honestly, accurately, and truthfully to the alleged occurrence of a chronic neck condition. My client disputed the existence of the chronic neck condition and therefore responded in the manner that he did. He had been to a chiropractor right before he submitted these. That's accurate, Your Honor. Correct? That is accurate. Did the insurance company know about those visits? No, the insurance company did not at that time know about those visits. Did they know about the chiropractor? They did not know about the chiropractor. And the reason that is our position, with respect to the initial application, Dr. Harrington was asked whether he had had any condition related to disorders of the muscles or joints. That's question 2 sub G in the insurance applications, which are found at 46 and 54 of the record. There's two identical copies of those applications. And it's our position that the follow-on question, which was question 4D, it asks, as a catch-all, are there any other illnesses, items, consultations, treatments, that sort of thing in the last five years that you haven't already told us about? And he answered no to that question. It's our position that's not a misrepresentation because of the Doctrine of the Justum Generis, which holds that when there's a list of items about which a general question refers, then that general catch-all question only refers to the items referenced previously. Great West did not establish, and there's no information in the record to assert, that the question about muscles and joints or disorders of the muscles and joints is something that would give rise to information or disclosure about numbness or paresthesia, or that it would be reasonable for the applicant to conclude that a question about disorders of the muscles or joints would be inquiring about a numbness or a paresthesia condition. Therefore, when it went on to ask about any other consultation you haven't already told us about, it was referencing consultations related to muscles and joints and did not encompass this information about numbness and paresthesias. And, counsel, I just want to make sure what we're reviewing here. A lot of our questions, and when I think about this case, I almost want to think it like a juror, like, what do I think happened here? I take it that's not what we're reviewing here. We're reviewing whether any reasonable juror could come to that conclusion on a summary judgment standard. That's correct, Your Honor. And it's our position that with respect to... Now, if the court determines that there was a misrepresentation in this initial application, there's the question of materiality. The case law in Illinois is clear that that's a question that's typically reserved for the jury to determine whether or not a misrepresentation was, in fact, material. But let me ask it this way. Let's say I think, come on, that your client, he was playing games here. That's just my personal belief, let's say. That's not the question. The question is, is that could a reasonable juror, based on the record before us, come to a different conclusion, correct? Correct, Your Honor. Yes, and it's our position that they could because of the ambiguous language in the musculoskeletal questionnaire, because of the adjustum generis issue regarding Item 4D, and because, frankly, under Illinois law, the insurance company is entitled to rely on the truthfulness of the applicant's responses unless it's on notice that there may be an issue that's incorrect in those responses. Counsel, what about the ER 47? In the last five years, have you had a checkup, consultation, illness, surgery, et cetera, not mentioned above? Yes, Your Honor. It's our position that that consultation pertained to questions in the prior, pertained to the prior questions, which included this inquiry about muscles and joints, and that it's unclear that that is triggering or requesting information about a numbness or a paresthesia condition. And so your position is that there was no obligation to reveal the consultation with the chiropractor? That's correct, because it's our position that the application was not sufficiently specific in its request for that information. Now, if the Court disagrees, it's also our position the Great West was already on notice as to the condition, no harm, no foul. It's evidenced by the musculoskeletal questionnaire. The Great West understood this could be an issue because of the Dr. Pena issue record, and made an inquiry subsequent to that, which brings us back to the musculoskeletal questionnaire. I thought I read somewhere in the briefing that your argument was on ER 46, because it said medical questionnaire and that the chiropractor is not an actual medical doctor, so it wouldn't trigger an obligation to reveal a non-medical doctor's treatment. That is part of what's at issue, Your Honor, and that came up in the claim documentation that was filed after my client was diagnosed with carpal tunnel syndrome. There was an inquiry from the insurance company as to whether there had been any physician visits for this item previously, and subsequent to that point, Great West said, hey, you didn't tell us about the chiro, and the reason being that chiropractors are not physicians under state law in California. And was there any argument as to this document? Because this document says medical questionnaire. I wasn't sure you were making that same argument as to this, where your client would say, look, it said medical questionnaire. I'm thinking doctor, and I did not actually see a doctor for this treatment. Well, that's part of the issue, Your Honor, but specifically the medical questionnaire asks about the Dr. Pena record from December 2011, and so all of my client's responses were tied to what was going on with respect to that analysis. I thought that was the muscitella. Yeah, that's what I'm trying to clarify. Yeah, there are two documents here. So there's the document, the muscular skeletal, where he handwrites in the information. Then there's a document Judge O'Scanlan was just asking about which says medical questionnaire for ADA income protection. The application. Actually, I was not talking about that one. That's the third one. I was looking at the application. I lost the page, I'm sorry. But the application itself, which asks the same question. Correct, yes. It's our position that it would not trigger, certainly because of the items I've indicated, but certainly to the extent that that's requesting medical information, that would not have triggered that kind of a response. Now, with respect to whether or not the court should have allowed this to go to a jury, it's our position that the factual issues animating the rescission claim of Great West and the breach of contract claim from Dr. Harrington are the same. Great West wants to make this an issue of the contract being void ab initio. That's fine if the factual issue animating that argument is distinguishable from the issues that we raise in the breach of contract argument. They're not distinguishable. It's the same central inquiry, which is, did Dr. Harrington make misrepresentations? Were those misrepresentations material? It's our position that that factual issue, that set of items, is what's at issue in both of those claims. And as a consequence, even the dollar systems case cited by Great West would require that the court allow that issue to go to a jury. Why don't you save the rest of your time for rebuttal? I will. Thank you, Your Honor. Good morning, Your Honors. May it please the court. My name is Joe Forche and I represent plaintiff, appellee, and counter-defendant Great West Life and Anody Insurance Company. Distilled to its essence, this case really presents only one question, and that is, did the defendant present evidence to give rise to a genuine issue of disputed fact precluding summary judgment? The answer is an emphatic no, and that is the answer that the district court rendered in granting summary judgment in favor of Great West. There's two primary issues that were addressed to the district court and which have been presented to this court, and the first is, was the evidence of misrepresentations by Mr. Harrington uncontroverted? And the answer to that is yes. Even Dr. Harrington's deposition testimony acknowledged that in response to the application questions, among others, whether or not he had any sort of consultation not referred to in response to some of the earlier questions raised in the application, he acknowledged in his deposition that his answer was incorrect, that in fact he had had consultations not mentioned in response to the earlier questions in the application. And on this point, I think it's appropriate to mention some of the points that Mr. Perrero raised just a moment ago, one of which is that a general question is somehow subsumed in the more specific question. Well, I would submit, Your Honor, that the legal concept upon which Mr. Perrero is relying here is simply not applicable because if you look at the specific questions asking about specific maladies and symptoms and diseases and syndromes that are identified in the earlier parts of the application, then you move down and the question in 4D becomes, are there any other consultations, checkups, that you had that are not? This comes under the general heading, though, of medical questionnaire for ADA income protection. Then it begins, one, two. It talks about medical. It does. A reasonable person might think, well, they want to know if I have any doctor-related, medical-related conditions. I think that that's a strained interpretation of the application. Why? Well, because, Your Honor, it also— Do we look at this from the reasonable applicant or the reasonable insured or what? Well, the materiality question tinges on what a reasonable underwriter would be wanting to know about. Some of the questions that were asked about were, do you have any— I'm paraphrasing. Do you have any— But the claim here is that he may— is that Dr. Harrington made a misrepresentation when he submitted his application, and therefore you can void— you can rescind the whole thing, get your money back. Correct. Right? Yes. Right? So how do we—how does it—do we look at it from his perspective? No. I think the case law is fairly clear that what's material is what the questions that were asked and whether a reasonable underwriter— What if those questions are ambiguous? There has been no argument asserted on the district court or to this court that the questions raised in the application forms themselves were ambiguous. The only ambiguity argument that's been asserted by the appellant relates to the musculoskeletal questionnaire. And as to those, Your Honor, I would submit that the questions were not ambiguous. They were premise. Well, let me ask you this. Could you—is it clear that the medical questionnaire encompassed chiropractors? It didn't—it neither precluded the medical questionnaire. Yes. The musculoskeletal— No, I'm talking about the medical questionnaire. Is it clear? You know, if I were filling this out, I would know that medical questionnaire goes through all these and consultation is talking about consultation with a chiropractor. If I recall correctly, Your Honor, the initial application forms didn't draw a distinction between treating and health— But it does say medical questionnaire. It may use that terminology here. It says health information medical questionnaire. I agree, Your Honor. It does. But I don't think that that necessarily precludes the possibility that somebody could be treating— Well, that's what I was asking for. I'm looking at it from the applicant's perspective. Well, but then I think you'd have to read it in its totality, Your Honor. I don't think you can take one term in isolation that appears on an application and conclude that they can only be asking about medical doctors. When you read the more specific questions— Okay, no. Just put the—so they get this application back, and apparently they were able to— they acquired or obtained Dr. Pena's notes, his records, right? Her records, yes. Her records, and they note in there that he has his— Parasthesia. Yeah, parasthesia or whatever. He's in there for some treatment of some sort. Right. So they send him these follow-up questions. Correct. Right? Yes, Your Honor. And the first one he answers, he doesn't really say much, but they know they got Dr. Pena's records. That was from 26 months earlier. Right. So they send him a—his first response is really no response. Correct. So they send him another one. Right. And I guess what he must have thought, well, they know something. And his response was, this was a one-time occurrence due to a poor night's sleep, and no treatment was indicated. Now we just heard an argument that the header, regarding your history of chronic and strain, chronic neck strain noted in December 2011, I guess that's Dr. Pena. That's right. With parathesia. Yes. And bilateral hand numbness. What is the date of the last episode of pain? Now we just heard an argument that really what this was calling for was information on chronic neck pain. Well, it said that the prompt in the questionnaire said, chronic neck pain with bilateral hand numbness. Parathesia and bilateral hand numbness. It says with parathesia and bilateral hand numbness. I'll read it all to you, Your Honor. It says, regarding your history—this is the prompt. What page of the record are you talking about? Well, the first questionnaire is volume 2 of the excerpts of record, page 65. And the second has identical language, and that appears at volume 2, page 69. 65 and 69. Got it. Thank you. Correct, Your Honor. And the prompt reads, and this is referencing, as Judge Pai has noted in his conversation with Mr. Perreiro, regarding your history of chronic neck strain noted in December 2011 with parathesia and bilateral hand numbness. I would point out, Your Honors, that at the time of his deposition, Dr. Harrington was asked, did you understand that Great West was inquiring about chronic neck strain? The answer was yes. And then, did you also understand that Great West was inquiring about parathesia and bilateral hand numbness? And his answer, again, was yes. So there's really no ambiguity there. It was understood that Great West was using language that it had extracted from Mr. Harrington's medical records and asking specific questions about that. And the answers that it got was, initially, this is a medical record that doesn't exist. Great West concluded that Dr. Harrington had not given the questionnaire the attention it deserved. It followed up again. That's when he said that was a one-time incident, and it resolved and no further treatment was necessary. On that first one, medical record does not exist, that seems to be consistent with his argument that there's a distinction between medical information and other. I can't tell, Your Honor, what was in his head, other than what he said in his deposition, which was he understood that Great West was asking about the symptom, not about whether it was a medical record or some other type of record. And as to that, the musculoskeletal questionnaires, which it's important to recall, were generated before Great West issued the insurance policies at issue. Those documents specifically asked about chiropractic treatment relative to the same symptoms that were identified in the Pena medical record. And as to that, there was essentially an answer of N-A, not applicable. The same documents we were just talking about, on 65 and 69, item number? Correct, Your Honor, but it's only on page 65 that he, Dr. Harrington, even bothered to respond to some of the specific questions relative to this issue. No, 69. 69 is where he answers no, not N-A. Correct, Your Honor. Actually, on page 70. There you see question 12, please advise the complete name, address, and phone number of the doctor or chiropractor providing the treatment. Because Great West was certainly aware at that point in time that some people see chiropractors for various conditions, and that issue was addressed in the uncontroversial. But why did they just, you know, in this application, back to the original application, why didn't they just note, medical information includes any visits to chiropractors, you know, whoever, any treatment provider? I think that Great West was giving Dr. Harrington the opportunity with respect to that issue in responding to the musculoskeletal questionnaire. Keep in mind, Your Honor, it isn't Great West's intention, when it issues insurance policies, to necessarily exclude coverage. It's looking for preexisting conditions, because in a disability insurance policy, it's material to the risk that's being assumed by the insurance carrier to know if there's certain conditions that exist at that time. And so it was asking about the one incident in the record that Great West had that made reference to it. By the way, any question about whether or not this condition and these questions were material to Great West ought to be disposed of by the fact that when they were careful enough to see one incidence referenced in the 2011 records and asked about it, and the answer, in effect, was, we had, this has never come up again. I've never had another incident of it again. It didn't recur. No treatment was necessary. And Great West was entitled, as a matter of law, to rely on the truthfulness of that response. But it wasn't a truthful response. Six weeks prior to the initial application form, Dr. Harrington had visited chiropractor Michael Peck, and Dr. Peck's records, which Great West did not have during the application process, indicated that he had visited for bilateral hand numbness in February of 2013, just six weeks prior to Dr. Harrington's initial application. Two weeks later, in March of 2013, he's back again, and this medical record says he's had increasing frequency of bilateral hand numbness. And yet Dr. Harrington didn't think it was important enough to notify Great West. The fact of the matter is, Your Honors, if you look at the timeline of events that occurred in this case, it's clear that Dr. Harrington was aware of the fact that he was experiencing issues relative to numbness and pain and tingling in his hands that made it difficult for him to exercise his practice as a dentist. And he applied for disability insurance, and he was paid over a million dollars in disability insurance coverage because he didn't think it was necessary to disclose to Great West these symptoms that he was having and the fact that he had consulted, as Great West asked him, with a health care provider. And when it followed up seeking more information and asking more specific questions, which it was entitled to do, he didn't get a clear response. When did Great West learn about Dr. Peck? What? I'm sorry? When did Great West learn about Dr. Peck? It learned about him in 2016, Your Honor. Great West engaged in routine monitoring of a claim to make sure, as is common in the disability insurance policy setting, to make sure that Dr. Harrington was, you know, It obtained in the course of that a record from one of his other treating health care providers, Dr. Mustafa Abu Samra. And in his notes, he noted that Dr. Harrington had been experiencing certain problems and had been treating with a chiropractor. That's all it said. Looking at that record, Great West followed up with Dr. Harrington and said, We see from your visit to Dr. Mustafa Abu Samra that you have been visiting with a chiropractor. Who's the chiropractor? And in response, Dr. Harrington, for the first time, disclosed Dr. Peck. And that was in 2016. And that led to the termination of benefits. Ultimately, after Great West went and obtained Dr. Peck's medical records, which show that it wasn't just that he was treating with him at that time in 2016, but he was treating with him as early as 2010. And also then in 2013, four and six weeks prior to Dr. Harrington reaching out and obtaining applications for the disability insurance coverage. Excuse me. I didn't quite get the first connection to Dr. Peck. How did the company learn about Dr. Peck? Well, so Great West follows up and routinely monitors the claim to make sure for it. This is after he started receiving benefits. Two years after, three years after he started receiving benefits. But how did they know about Dr. Peck? Because one of Dr. Harrington's other providers, Dr. Abu Samra, made mention of it in one of his medical records that Dr. Peck. Which was already in the application? Where did that come from, I guess? What's the source of that? So Great West reaches out to these doctors who are continuing to provide services to him. And one of these doctors noted in one of his notes that Dr. Harrington was treating with a chiropractor. And that's the first notice that Great West ever had, that Dr. Harrington was treating with a chiropractor. But these other doctors were disclosed. Yes. Okay. But those doctors were only disclosed in connection with the initial claim. They weren't, to our knowledge, Your Honor, for example, Dr. Abu Samra was not somebody that he was treating with at the time that he applied for coverage. Once the coverage was issued, he visited Dr. Abu Samra, who treated him for carpal tunnel syndrome. So we only knew about him at the time that the claim was made. The claim, okay, got it. Let me ask you this. So if Dr. Harrington were to prevail on this appeal and it goes back to the district court, what role is there for a jury? Well, under Illinois law, Your Honor, I don't believe there's any issue that ought to be decided by a jury. But he's got to reach a contract claim, so that's a legal claim. It is a legal claim, but the claim is governed by California law or Illinois law. And the real question, initially, Great West is entitled to present evidence with respect to whether there was a misrepresentation. If there's a determination that there was, then the contract is voided. There is no issue remaining to be decided by a jury or by the court. The court could decide. Could the court decide that question first and then move to a jury trial if he decides in favor of Dr. Harrington? The court could, but the one issue that would remain to be decided by the court under Illinois law would be whether or not a statutory penalty would apply under the circumstances of this case. And we've presented information in our briefing with respect to that issue, and that is that if there's a bona fide defense that's presented, and here there is one, then the statutory penalty claim can't prevail as a matter of law. Okay. All right. Thank you. Thank you, Your Honor. Great West wants this court to focus on answers. Dr. Harrington asks this court to focus on the questions. We're going to the question. Your entire position, as I understand it, turns on the word medical in the questionnaire. Is that pretty much the essence of your argument? The essence of the argument is that Great West failed to ask the questions that it now blames Dr. Harrington for not giving answers to, and that includes the issue of having identified these as a medical set of questions. It includes the ambiguity that was in the musculoskeletal questionnaire, and it includes the issue I addressed previously regarding the general question, that catch-all question in 4D of the application. But the misrepresentation turns, does it not, on the application, which states that he had no consultation? That is Great West's position. Okay, but I'm trying to be sure I understand your position. Your position seems to be, as I understood it, that the word medical in that application means that he does not have to disclose anything to do with a chiropractor because a chiropractor is not medical. Do I have that right? That's correct, Your Honor. Yeah, but that very form at question 12 specifically mentions chiropractor. So it's my understanding, Your Honor, that the initial application, which is at 46 and 54 of the record, is described as a medical questionnaire, and that the musculoskeletal questionnaire gives a prompt that specifically references That's after he submits his application. That's correct, Your Honor. That's after the initial application is submitted. They're looking at his records, and they see the note in Dr. Pena's records, which prompts the musculoskeletal questionnaire. That's correct, Your Honor. But this is all considered part of the application process, is it not? That's correct, Your Honor. Okay. And it's our position that because of how these questions were framed, Dr. Harrington provided accurate responses as he understood them at the time. Great West makes a big deal out of deposition testimony where my client indicated that a consultation could include a visit to a chiropractor. Great West, in that context, did not clarify whether that was Dr. Harrington's understanding on the date of the deposition or if that was his understanding on the date he submitted the application. Moreover, Great West makes a big deal out of asserting that Dr. Harrington agreed that the musculoskeletal questionnaire talked about chronic neck pain and that it talked about paresthesias. All they're asking is, did it include that language in the prompt? It doesn't ask whether Dr. Harrington understood the paresthesias were tied to this chronic neck condition or not. Clearly, Dr. Harrington understood that it was a reference to a condition that didn't exist. Quick question for you, counsel. So I asked you a question earlier about what exactly we're reviewing here, whether it's summary judgment or a bench trial. There was no bench trial. It's a summary judgment motion. Let's say I were to conclude, you know what, maybe a reasonable juror could buy the story your client's pitching here. It goes back to the trial court. Would there be, and I know there's a whole question about whether there would be a bench trial or a jury trial and the different types of claims, but there has been no actual testimony from your client yet under oath before a district court judge, correct? Correct. So you would be asking for that opportunity whether it be a bench trial or a jury trial? That's correct. With the understanding that the district court might say this is a bunch of baloney. Of course he was lying on this thing, but that's, in a sense, you're asking for the opportunity to make that case. That's correct, Your Honor. Yes. So, Your Honor. Anything further? You're over your time. Nothing further, Your Honor. Thank you. Thank you. Okay, counsel. Thank you very much. The matter is submitted at this time, and that ends our session for today. Thank you. All rise. This court for this session stands adjourned.
judges: O'scannlain, Paez, Owens